## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| **TONY L. THOMPSON,** | **)** | |
| | **)** | |
| **Plaintiff,** | **)** | |
| | **)** | **No. 12 C 7997** |
| **v.** | **)** | |
| | **)** | **Magistrate Judge** |
| **CAROLYN W. COLVIN, Acting** | **)** | **Maria Valdez** |
| **Commissioner of Social Security,[1]** | **)** | |
| | **)** | |
| **Defendant.** | **)** | |
| | **)** | |

## MEMORANDUM OPINION AND ORDER

This action was brought under 42 U.S.C. § 405(g) to review the final decision

of the Commissioner of Social Security denying Plaintiff Tony L. Thompson's claims

for Disability Insurance Benefits and Supplemental Security Income. The parties

have consented to the jurisdiction of the United States Magistrate Judge pursuant

to 28 U.S.C. § 636(c). For the reasons that follow, Thompson's motion for summary

judgment is granted, and the Commissioner's cross-motion for summary judgment

[Doc. No. 28] is denied.

## BACKGROUND

### I.   PROCEDURAL HISTORY

On August 31, 2009, Thompson filed claims for both Disability Insurance

Benefits and Supplemental Security Income, alleging disability since February 1,

2009. The claim was denied initially and upon reconsideration, after which he

---

[1] Carolyn W. Colvin is substituted for her predecessor, Michael J. Astrue, pursuant to
Federal Rule of Civil Procedure 25(d).

timely requested a hearing before an Administrative Law Judge ("ALJ"), which was held on June 21, 2011. Claimant personally appeared and testified at the hearing and was represented by counsel. Medical expert Dr. Ashok Jilhewar, psychological expert Dr. Marva Dawkins, and vocational expert Linda Gels also testified.

On July 28, 2011, the ALJ denied Thompson's claims for both Disability Insurance Benefits and Supplemental Security Income, finding him not disabled under the Social Security Act. The Social Security Administration Appeals Council then denied Claimant's request for review, leaving the ALJ's decision as the final decision of the Commissioner and, therefore, reviewable by the District Court under 42 U.S.C. § 405(g). *See Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2005).

## II.    FACTUAL BACKGROUND[2]

### A.    <u>Medical Evidence</u>

#### 1.    *<u>Physical Impairments</u>*

Thompson experienced swelling and pain in his right knee beginning in August 2008. A September 15, 2008 evaluation by the Jesse Brown VA Medical Center ("VA") stated that the symptoms were consistent with gouty arthritis. Fluid was drained from his knee, and the joint fluid analysis was consistent with inflammatory arthropathy. He was given a cane for gait abnormality and was provided training in the use of the cane by a physical therapist. Thompson was diagnosed with osteoarthritis in his big toe on September 20, 2008.

Plaintiff returned to the VE on October 10, 2008 with worsening right knee and toe pain. His knee was extremely tender on examination, and he had bursitis

---

[2] The following facts from the parties' briefs are undisputed unless otherwise noted.

near the medial collateral ligament and inflammation in the knee joint. He was treated with steroid injections. On January 2, 2009, Thompson returned to the VA for the same issues. He claimed that the pain in his knee and toe worsened after sitting for a period of time. Thompson was told to maintain a regimen of non-steroidal anti-inflammatory drugs and to use a cane to help with the pain. Thompson went back to the VA less than four weeks later complaining of right knee pain. An MRI showed he had a sprained ACL and a popliteal cyst. Thompson stated at a follow-up visit on March 27 that his knee and toe pain continued, and his knee also would swell. He was prescribed Naproxen and referred for a right knee brace fitting.

On January 18, 2010, Thompson saw Dr. Mahesh Shah for a consultative examination, where he complained of severe, gouty arthritis in both legs and a history of hematuria and benign prostatic hypertrophy. An x-ray of the left knee showed a marked degree of degenerative disease in the medial compartment.

A March 8, 2010 Residual Functional Capacity ("RFC") assessment completed by state agency reviewer Dr. George Andrews concluded that Thompson was limited to lifting twenty pounds occasionally and ten pounds frequently; standing or sitting about six hours out of an eight-hour workday; only occasionally climbing ladders, ropes, or scaffolds; and only occasionally stooping, kneeling, or crawling. Dr. Andrews concluded that Thompson's claims that he was limited in walking and squatting due to knee pain were credible and consistent with the objective medical findings.

On April 26, 2011, Thompson reported that he had difficulty walking due to acute gout flare-ups in his feet, and he believed that his acute pain in his right knee and big toe were caused by his osteoarthritis, following recent work activities and standing more than normal. The clinical notes, however, stated that despite the gout diagnosis, he had a negative synovial fluid analysis for crystals in 2008, and while there was apparently an exacerbation of osteoarthritis, his "joints today are not [consistent with] gouty arthritis." (R. 934.)

Thompson also experienced prostate problems, and he was noted by Dr. Patel on March 4, 2009 to have symptoms of hematuria, dysuria, urinary frequency, nocturia, and incomplete voiding. His prostate was enlarged and tender. A September 28, 2009 CT scan of Thompson's abdomen showed that his prostate gland was enlarged and protruding into the bladder base. In October 2009, he was prescribed medication to alleviate his urges to urinate frequently.

### 2. *Mental Impairments*

Beginning around April 13, 2009, Thompson was treated at the VA for his mental health issues. He regularly attended group psychiatric sessions for cocaine and alcohol dependence, and from April 28, 2009 to April 26, 2011, he had individual therapy sessions with psychologist Dr. Joseph Piszczor and Horace Jones, an addiction therapist. Dr. Piszczor diagnosed Thompson with depression and psychosis, as well as impulse and aggression tendencies. He was given a prescription for Risperidone, an antipsychotic medication. Plaintiff met with a state

psychologist, Michael Ingersoll, on February 1, 2010, who concluded that there was evidence of mild depression.

In June 2010, Thompson was seen for nearly suicidal depression, although his physician concluded that he was not currently suicidal, homicidal, or psychotic. Plaintiff told his psychiatrist that he had been depressed for several years, but it got much worse after he became homeless in 2007. He reported his depression was often at a 7 on a scale of 10, and he experienced mood swings, a short attention span, thoughts of suicide, crying spells, auditory hallucinations, and heated arguments, one of which nearly resulted in him beating a person with a bat. Therapy notes from June through August 2010 noted depression rated between 5 and 7, with the level and duration of the depression varying day by day; several verbal arguments with family members and strangers; auditory hallucinations; and borderline concentration.

From January to March 2011, Plaintiff reported difficulty concentrating at work; depression due to changes at work; minor accidents at work; altercations on the job, including a physical confrontation with a co-worker who had bumped into him; and a down mood with increased episodes of depression lasting up to a half day. On December 28, 2011, Thompson again spoke of work accidents and loud verbal arguments; depression lasting up to seventy percent of the time; poor concentration; thoughts of hurting someone; and auditory hallucinations.

Thompson's Global Assessment of Functioning ("GAF") was evaluated throughout 2009 to 2011, and the score ranged from 45 in May through September

of 2009 and in June 2010; to 52 in August through November 2010; to 48 on February 15, 2011. Scores between 41 and 50 suggest serious symptoms, such as suicidal ideation, or serious impairment in social, occupational, or school functioning; and scores between 51 and 60 denote moderate symptoms or moderate difficulty in social, occupational, or school functioning.

### C. **Plaintiff's Testimony**

Thompson testified that he last tried to work two months before the hearing, when he was employed as a spotter for a freight company. He had difficulty with this job because switching equipment caused him trouble operating a clutch, and pain from gout affected his ability to operate the equipment. He also had a problem with frequent urination due to his prostate; he had to urinate every fifteen to twenty minutes, which caused him to sometimes urinate behind and outside trailers at the job site. Thompson used a cane for over a year in order to ambulate.

Thompson had problems meeting the demands of the job at the freight company, which led to episodes of anger. Plaintiff also experienced suicidal ideations, heard voices, had crying spells, and was paranoid at night, needing to check doors and windows. He was in both mental health treatment and drug treatment; the drug and alcohol treatment provided support for his efforts to deal with his emotions. He attended the drug and alcohol group three to four times a month. A typical day for Thompson was spent reading, attending meetings and appointments, and spending time with his children. He also maintained contact with some Veteran friends. He sometimes helped clean the house.

### D.    **Vocational Expert Testimony**

The ALJ asked Vocational Expert ("VE") Linda Gels whether a hypothetical person with the same age, education, and work experience as Plaintiff, and a residual functional capacity ("RFC") limiting him to light work with certain additional limitations could perform any of Plaintiff's past work. The VE said that the person could not, but other jobs would be available, including cafeteria attendant, small products assembler, machine tender, and hand packager. Those positions, however, would be eliminated if he required a cane to ambulate. All of the jobs would also have zero tolerance for verbal outbursts at the public, co-workers, or supervisors. The jobs would also not be available to someone who consistently needed extra breaks throughout the workday.

### D.    **ALJ Decision**

The ALJ found at step one that Plaintiff had not engaged in substantial gainful activity since his alleged onset date of February 1, 2009. At step two, the ALJ concluded that Thompson had severe impairments of osteoarthritis, degenerative joint disease of the knees, history of hematuria secondary to enlarged prostate, psychotic disorder, major depressive disorder, and a history of substance abuse. The ALJ concluded at step three that the impairments, alone or in combination, do not meet or medically equal a Listing. The ALJ then determined that Thompson retained the RFC to perform work at the light exertional level with certain additional limitations. Specifically, the ALJ opined that Plaintiff could only occasionally climb ladders, ropes, or scaffolds; balance; kneel; crouch; or crawl. In

addition, Thompson was limited to work that did not involve complex or detailed instructions; had brief superficial contact with the public and supervisors; and had simple, routine, one-to-two step tasks and expectations that did not change on a day-to-day basis. At step five, based upon the VE's testimony and Claimant's age, education, work experience and RFC, the ALJ concluded that Claimant can perform jobs existing in significant numbers in the national economy, leading to a finding that he is not disabled under the Social Security Act.

## DISCUSSION

## I.    ALJ LEGAL STANDARD

Under the Social Security Act, a person is disabled if she has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(a). In order to determine whether a claimant is disabled, the ALJ considers the following five questions in order: (1) Is the claimant presently unemployed? (2) Does the claimant have a severe impairment? (3) Does the impairment meet or medically equal one of a list of specific impairments enumerated in the regulations? (4) Is the claimant unable to perform her former occupation? and (5) Is the claimant unable to perform any other work?  20 C.F.R. § 416.920(a)(4).

An affirmative answer at either step 3 or step 5 leads to a finding that the claimant is disabled. *Young v. Sec'y of Health & Human Servs.*, 957 F.2d 386, 389

(7th Cir. 1992). A negative answer at any step, other than at step 3, precludes a finding of disability. *Id.* The claimant bears the burden of proof at steps 1–4. *Id.* Once the claimant shows an inability to perform past work, the burden then shifts to the Commissioner to show the claimant's ability to engage in other work existing in significant numbers in the national economy. *Id.*

## II.     JUDICIAL REVIEW

Section 405(g) provides in relevant part that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Judicial review of the ALJ's decision is limited to determining whether the ALJ's findings are supported by substantial evidence or based upon legal error. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000); *Stevenson v. Chater*, 105 F.3d 1151, 1153 (7th Cir. 1997). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). This Court may not substitute its judgment for that of the Commissioner by reevaluating facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility. *Skinner*, 478 F.3d at 841; *see also Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008) (holding that the ALJ's decision must be affirmed even if "'reasonable minds could differ'" as long as "the decision is adequately supported") (citation omitted).

The ALJ is not required to address "every piece of evidence or testimony in the record, [but] the ALJ's analysis must provide some glimpse into the reasoning

behind her decision to deny benefits." *Zurawski v. Halter*, 245 F.3d 881, 889 (7th Cir. 2001). In cases where the ALJ denies benefits to a claimant, "he must build an accurate and logical bridge from the evidence to his conclusion." *Clifford*, 227 F.3d at 872. The ALJ must at least minimally articulate the "analysis of the evidence with enough detail and clarity to permit meaningful appellate review." *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005); *Murphy v. Astrue*, 496 F.3d 630, 634 (7th Cir. 2007) ("An ALJ has a duty to fully develop the record before drawing any conclusions . . . and must adequately articulate his analysis so that we can follow his reasoning . . . ."); *see Boiles v. Barnhart*, 395 F.3d 421, 425 (7th Cir. 2005).

Where conflicting evidence would allow reasonable minds to differ, the responsibility for determining whether a claimant is disabled falls upon the Commissioner, not the court. *See Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990). However, an ALJ may not "select and discuss only that evidence that favors his ultimate conclusion," but must instead consider all relevant evidence. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994).

## III. ANALYSIS

Thompson argues that the ALJ's decision was in error because: (1) the ALJ's credibility finding was improper; (2) he should have been limited to a sedentary RFC; (3) the ALJ did not provide a basis for his mental RFC finding; and (4) the ALJ decision was based on unreliable VE testimony.

### A.    Credibility

Plaintiff claims that the ALJ's credibility finding was in error because it mischaracterized or ignored significant evidence. First, he claims that the ALJ drew too fine a line when concluding that there was no evidence he suffered from gout, given that a doctor had described his knee pain as arising from "gouty arthritis." And with regard to his mental limitations, Plaintiff claims that the ALJ did not give sufficient weight to evidence of his suicidal ideations and his need to attend regular weekly therapy sessions, which affects his ability to work.

The Commissioner responds that the ALJ's statement about gout was only a portion of the analysis, and the ultimate conclusion that the objective evidence did not support his complaints of pain was supported in the record. The ALJ's credibility determination also relied on other factors, including the lack of corroborating objective evidence, Thompson's continued efforts to secure employment, and his minimal use of pain medication. As for his need to attend therapy sessions, Defendant contends that the ALJ properly noted Thompson's regular participation in group therapy and his motivation to maintain recovery. Moreover, Defendant states that the ALJ relied on substantial evidence in the form of Dr. Dawkins's testimony in finding that the RFC accounted for any mental limitations.

An ALJ's credibility determination is granted substantial deference by a reviewing court unless it is "patently wrong" and not supported by the record. *Schmidt v. Astrue*, 496 F.3d 833, 843 (7th Cir. 2007); *Powers v. Apfel*, 207 F.3d 431,

435 (7th Cir. 2000); *see also Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008) (holding that in assessing the credibility finding, courts do not review the medical evidence *de novo* but "merely examine whether the ALJ's determination was reasoned and supported"). However, an ALJ must give specific reasons for discrediting a claimant's testimony, and "[t]hose reasons must be supported by record evidence and must be 'sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.'" *Lopez* ex rel. *Lopez v. Barnhart*, 336 F.3d 535, 539-40 (7th Cir. 2003) (quoting *Zurawski*, 245 F.3d at 887-88); *see* SSR 96-7p, 1996 WL 374186, at *4 (S.S.A. 1996).

The lack of objective evidence is not by itself reason to find a claimant's testimony to be incredible. *See Schmidt v. Barnhart*, 395 F.3d 737, 746-47 (7th Cir. 2005). When evaluating a plaintiff's credibility, the ALJ must also consider "(1) the claimant's daily activity; (2) the duration, frequency, and intensity of pain; (3) the precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of medication; and (5) functional restrictions." *See Scheck v. Barnhart*, 357 F.3d 697, 703 (7th Cir. 2004); *see* SSR 96-7p at *3. When the claimant attends an administrative hearing, the ALJ "may also consider his or her own recorded observations of the individual as part of the overall evaluation of the credibility of the individual's statements." SSR 96-7p at *5.

While the ALJ's credibility determination relied in part on the language sharply criticized by the Seventh Circuit in *Bjornson v. Astrue*, 671 F.3d 640, 645

(7th Cir. 2012), the decision went beyond the boilerplate by noting that some evidence in the record questioned whether Thompson actually suffered from gout; he could remain active despite toe pain when wearing steel-toed shoes; he often ambulated, despite a limp, without an assistive device; although an x-ray showed a marked degree of degenerative disease, there was no evidence of fracture, dislocation, or other abnormalities; and he continued to seek employment through 2010.

First, the fact that he attempted to find work, and worked briefly on a part-time basis, does not establish that his allegations of disability are incredible. *See Henderson v. Barnhart*, 349 F.3d 434, 435 (7th Cir. 2003) (explaining that "[t]he ALJ at least should have questioned [the plaintiff] about her reasons for working . . . after the alleged onset of disability"); *see also Czarnecki v. Colvin*, -- Fed. Appx. -- 2015 WL 55438, at *8 (7th Cir. Jan. 5, 2015) (unpublished decision) (faulting ALJ for finding a claimant's work efforts were inconsistent with disability, particularly where the claimant had to stop working due to pain); *Shauger v. Astrue*, 675 F.3d 690, 697 (7th Cir. 2012) ("[E]ven persons who *are* disabled sometimes cope with their impairments and continue working long after they might have been entitled to benefits.") (emphasis in original).

Second, Thompson's description of his pain as caused by gout is not made incredible by evidence questioning that diagnosis. The ALJ pointed to no medical evidence questioning whether he suffered from pain at all, only that it may not have been gout. Thompson allegedly suffered from pain and had been told the pain was

gout; it defies logic that his continued use of the term affects his credibility. Similarly, the fact that the x-ray showed no fractures does not demonstrate Thompson does not experience knee pain, given that the same x-ray showed "a marked degree of degenerative disease." Finally, as will be discussed in more detail below, Thompson's failure to use an assistive device does not, by itself, lead to a finding that his stated impairments lack credibility. The Commissioner is directed to reevaluate Plaintiff's credibility on remand.

**B.**    <u>**Physical RFC**</u>

Performing work at the light exertional level requires that a person be able to walk and stand for several hours in a workday, as well as push and pull with arm and leg controls. Plaintiff contends that in concluding he could work at the light level, the ALJ improperly failed to consider the severity of his knee pain, the limitations evidenced by his previous employment, and his need for a cane, which would preclude work at the light level.[3] Had Plaintiff been limited to sedentary work, he would have been found disabled due to his age and lack of transferrable skills.

According to Plaintiff, the ALJ improperly cherry-picked the record by noting that despite Thompson's knee pain, he "refused" to use a cane and was "unwilling" to ambulate despite his right knee's full range of motion. Plaintiff argues that he

---

[3] Plaintiff also argues that work at the light level would be precluded by his frequent need to urinate, as much as every fifteen to twenty minutes. According to the VE, no employer would tolerate the need to take extra breaks throughout the day. The Court agrees with the Commissioner that substantial evidence supports the ALJ's conclusion that Thompson experienced significant improvement in his condition with medication, and thus the Commissioner's conclusion will not be disturbed.

was diagnosed with degenerative disease in both knees affecting his ability to walk, he walked with a limp, and he experienced gout flare-ups. Thompson also takes issue with the ALJ's emphasis on the fact that he was not prescribed a cane for walking, given that his doctor encouraged him to use one. Moreover, Thompson had difficulty performing his past jobs as a truck and forklift driver, despite the fact that they involved a great deal of sitting, because his foot pain increased after sitting for a period of time, and he also had difficulty operating the foot controls.

The Commissioner responds that the ALJ was correct to assign great weight to the opinion of the consulting and testifying experts, who concluded that Thompson could stand/walk for six out of eight hours, and that substantial evidence supports the ALJ's conclusion that the medical evidence did not demonstrate any additional limitations. Specifically, the ALJ found that despite a 2008 x-ray of Thompson's right foot showing moderately severe degenerative changes, he was able to remain active despite the pain when he wore steel-toed shoes. A January 2009 MRI showed no significantly abnormal findings, and while a January 2010 x-ray of his left knee showed a marked degree of degenerative disease, there was no evidence of fracture, dislocation, or other abnormality. Defendant also contends that the ALJ reasonably concluded that Plaintiff did not require the use of an assistive device to ambulate, even though he was given physical therapy on the use of a cane. According to the Commissioner, he has not established that it is "medically required" as defined in the regulations, which state that "there must be medical documentation establishing the need for a hand-held assistive device to aid in

walking or standing, and describing the circumstances for which it is needed." SSR 96-9p. Defendant notes that Thompson walked without using a cane at his January 2010 consultative examination and that despite a limp, he got on and off the examining table by himself; he could go from sitting to lying down without difficulty; he had only mild tenderness and some reduced flexion in his knees; he had full strength in both legs; he walked with a normal gait and posture in February 2010; he refused to use a cane in March 2009; and he was "unwilling" to walk on his own in April 2011 despite full range of motion and no knee swelling.

The Court concludes that the ALJ did not sufficiently explore Thompson's use of an assistive device for walking. It is well settled that the lack of a physician's prescription for a cane does not mean one is not needed. *See Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010) (finding that an ALJ "[a]bsurdly" thought claimant's use of a cane was suspicious because it had not been prescribed, where it had been suggested by an occupational therapist); *Terry v. Astrue*, 580 F.3d 471, 477-78 (7th Cir. 2009) (holding that using an unprescribed walker did not, by itself, suggest that claimant was exaggerating her symptoms). The fact that Thompson did not always rely on the use of a cane also does not require a conclusion that he never needs assistance to walk. Throughout the record, Plaintiff has described his knee and foot problems as "flare ups," which are exacerbated by certain activities. On remand, the ALJ is directed to explore Thompson's use of an assistive device in more detail, to determine if its use would mandate a finding that he is limited to the sedentary exertional level.

C.     **Mental RFC**

Plaintiff next contends that in formulating the mental RFC, the ALJ failed to adequately consider Thompson's limitations on concentration, persistence, and pace, as well as his low GAF scores.

1.     Concentration, Persistence, and Pace

Dr. Dawkins testified that Plaintiff had moderate limitations in concentration, persistence, and pace, and the ALJ credited her conclusions. Plaintiff maintains that the RFC's limitation to simple, routine tasks and hypothetical questions posed to the VE did not sufficiently account for these limitations. *See O'Connor-Spinner v. Astrue*, 627 F.3d 614, 620 (7th Cir. 2010) (explaining that "terms like 'simple, repetitive tasks' on their own will not necessarily exclude from the VE's consideration those positions that present significant problems of concentration, persistence and pace"). The Commissioner maintains that the limitations imposed by the ALJ address all the mental limitations he found credible. With respect to problems with concentration, the ALJ expressly noted them and relied on Dr. Dawkins's testimony that the limitations listed in the RFC would adequately account for that impairment. Furthermore, the Commissioner contends that the decision does not run afoul of *O'Connor-Spinner* because all of the limitations were included in the hypothetical questions posed to the VE.

Despite finding that Thompson's concentration was moderately limited, the ALJ did not list that limitation in his mental RFC finding, nor did he include it in his questioning of the VE. But because Dr. Dawkins testified that Plaintiff had a

moderate limitation in concentration, persistence, and pace, it can be presumed that the VE accounted for that limitation in her testimony. *See Steele v. Barnhart*, 290 F.3d 936, 942 (7th Cir. 2002); *see also Young v. Barnhart*, 362 F.3d 995, 1003 (7th Cir. 2004) ("The hypothetical need not include every physical limitation, provided that the vocational expert had the opportunity to learn of the applicant's limitations through, for example, . . . other questioning at the hearing."). However, it would be preferable for the ALJ to expressly address the issue of those limitations in formulating Thompson's mental RFC and to expressly include them in the hypothetical question posed to the ALJ. Accordingly, the ALJ is directed to do so on remand.[4]

### 2. GAF Score

Plaintiff argues that the ALJ should have discussed his low GAF scores as they relate to his ability to perform competitive work. Thompson's GAF scores ranged from 45 to 52 from 2009 to 2011. The Commissioner states that Plaintiff has not shown how the GAF score demonstrates his RFC should have been more limited; an ALJ is not required to address every piece of evidence in the record; and the reasoning behind his assessment of Thompson's mental RFC is adequately explained.

The Seventh Circuit has noted that "'nowhere do the Social Security regulations or case law require an ALJ to determine the extent of an individual's

---

[4]  Similarly, the VE heard testimony about Thompson's reported difficulty with co-workers, but a limitation on co-worker contact was not included in the RFC or the hypothetical questions. The ALJ on remand should more fully discuss whether the mental RFC and hypothetical questions to the VE should include limitation on contact with co-workers as well as with supervisors and the general public.

disability based entirely on his GAF score.'" *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010) (citation omitted) (explaining that the GAF score "does not reflect the clinician's opinion of functional capacity"). However, the failure to even discuss low GAF scores can highlight "a larger general tendency to ignore or discount evidence favorable to [Plaintiff's] claim." *Yurt v. Colvin*, 758 F.3d 850, 860 (7th Cir. 2014); *see also Czarnecki v. Colvin*, -- Fed. Appx. --, 2015 WL 55438, at * (7th Cir. Jan. 5, 2015) (unpublished opinion) (faulting the ALJ for failing to mention any of plaintiff's GAF scores, which ranged from 40 to 50). Thompson's GAF scores could tend to support other evidence in the record of his claims of mental limitations, but the ALJ failed to discuss them at all. *See Scrogham v. Colvin*, 765 F.3d 685, 698 (7th Cir. 2014) (holding that an ALJ may not selectively identify evidence that supports her conclusion, while ignoring related evidence that supports a finding of disability). The Court directs the ALJ on remand to examine the GAF scores in relation to his mental functional capacity.

### D. VE testimony

Thompson maintains that VE testified he could perform certain jobs, but the testimony was unreliable because the definitions of those positions in the Dictionary of Occupational Titles ("DOT") conflicted with the RFC determination. Citing the DOT, he argues that all of the positions involve more than one- or two-step tasks, and the jobs of cafeteria worker and small products assembler require more than brief superficial contact with the public and supervisors.

The Commissioner responds that the ALJ did ask the VE if her testimony was consistent with the DOT, and she responded that the DOT does not address all of a job's characteristics, such as brief contact with others. For those areas, she relied on her market survey and job placement experience. In addition, Defendant points out that Plaintiff's counsel did not challenge the consistency of the positions with the DOT during his questioning of the VE. The Court agrees with Defendant that Plaintiff's challenges to the VE's testimony do not establish an apparent conflict that would warrant remand.

"It is the Commissioner's burden at Step 5 establish the existence of a significant number of jobs that the claimant can perform." *McKinnie v. Barnhart*, 368 F.3d 907, 911 (7th Cir. 2004). If a vocational expert's opinion about job requirements is not contained in the DOT, "the adjudicator *has an affirmative responsibility* to ask about any possible conflict" between the opinion and the DOT. *Prochaska v. Barnhart*, 454 F.3d 731, 735 (7th Cir. 2006) (emphasis in original); *see* SSR 00-4p ("If the VE's . . . evidence appears to conflict with the DOT, the adjudicator will obtain a reasonable explanation for the apparent conflict."); *see also Overman v. Astrue*, 546 F.3d 456, 463 (7th Cir. 2008) (holding that a claimant's failure to raise the issue of an SSR 00-4p violation at the administrative level does not waive the argument).

In this case, Plaintiff argues that the VE's testimony conflicted with the DOT because counsel's reading of the DOT suggests that the listed jobs involve more than simple one- or two-step tasks or more than brief contact with the public and

supervisors. But even if Plaintiff's counsel's interpretation of the DOT were reliable evidence of a conflict, Plaintiff has not established that any "conflicts were obvious enough that the ALJ should have picked up on them without any assistance, for SSR 00-4p requires only that the ALJ investigate and resolve *apparent* conflicts between the VE's evidence and the DOT." *Overman*, 546 F.3d at 463 (emphasis in original). Accordingly, the VE's testimony was not unreliable for the reasons offered by Plaintiff.

## **CONCLUSION**

For the foregoing reasons, Plaintiff Tony L. Thompson's motion for summary judgment is granted, and the Commissioner's cross-motion for summary judgment [Doc. No. 28] is denied. The Court finds that this matter should be remanded to the Commissioner for further proceedings consistent with this Order.

**SO ORDERED.**                                   **ENTERED:**

 

 

**DATE:**  <u>  April 7, 2015</u>                _____
                                                 **HON. MARIA VALDEZ**
                                                 **United States Magistrate Judge**